You do me. I do me. Okay, the next case is number 16, 1616, Trading Technologies Intl v. CQG, Inc. Mr. O'Quinn. Thank you, Judge Newman. May it please the Court, John O'Quinn on behalf of CQG. When the District Court rendered its decision nearly two years ago, it did not have the benefit of this Court's many intervening precedents applying Alice, particularly recent cases such as Electric Power Group and Apple v. Amaranth, which are indistinguishable from this case. If it had, it would recognize that the claims here adhere to a familiar formula, which this Court time and again has found is ineligible for patenting. Specifically, the purported invention in this case is directed to the abstract concept of displaying and updating commodities market information and placing an order. And it is implemented using entirely- But doesn't this, the asserted claim, solve specific problems of prior graphical user interface devices in the context of computerized trading relating to speed, accuracy, and usability? So, Judge Wallach, there's nothing about the claims at issue here that affect the speed or the operation of the computer. This is a case that is entirely unlike EnFish, where there was something that was inventive about the particular combination of software that changed the functioning of the computer itself. And indeed, as the PTAB noted in instituting CBMR reviews here, quote, they do not contend the claimed invention somehow changes the way the computer functions, and that's at Appendix 3127. There's nothing about these claims that change how the computer operates. What has changed is the content that is being displayed on a computer. And as this Court recognized- How it displays. Well, it's not how it's being displayed, Judge Wallach, because I think just as an electric power group, this Court recognized that even though you were now having to display, you had to have concurrent visualization, and there was specific information that had to be displayed in specific fields, nonetheless, in electric power group, the Court was very clear. It used existing display technology, it used existing programming techniques, and that there was nothing that was inventive that was added to the abstract concept. Now, I recognize that the District Court here disagreed with us at both Step 1 and Step 2, but clearly, when you look at this Court's intervening precedence, Apple versus Amaranth, I think, is a great example of this decided just at the end of November, electric power group, as well as, frankly, BASCOM itself. When you look at those cases- You mean BASCOM, DDR Holdings, Penfish, they all seem to be on the other side of the aisle, correct? Well, I think, Judge O'Malley, that with respect to BASCOM and DDR Holdings, both recognize that the claims with more specificity than the claims at issue here were still nonetheless directed to abstract concepts. Now, DDR Holdings and BASCOM then went on, and at Step 2, found that there was an inventive step. And the reason was because in those cases, there was a specific, particular algorithm that was disclosed, and it was claimed in the claims themselves. And the Court recognized that this was not simply generic implementation of computer functionality. And, indeed, I think Enfish, of course, is a Step 1 case, but electric power group, at 1354 of that opinion, talks about how Enfish was focused not on asserting advances in uses to which existing computer capabilities could be put, but on a specific improvement in how computers carry out one of their basic functions. There is no improvement here to how computers carry out their basic functions. It is simply take a point-and-click display of any kind, any grid. You could use any kind of spreadsheet, any kind of point-and-click technology. What is different here is the information that is being displayed. And I think that if you look at this Court's opinion... I'm still thinking more like BASCOM and DDR Holdings with respect to this analysis. And I understand the District Court went to both steps, and it could be that I'm totally off base here. But this is the problem. This is the question I've asked in trying to sort out our case law and where the lines are drawn. But is it conceivable that the initial computerization that uses general computer technology would not be patent eligible? So, for instance, like the case we had last year, Chicago Board. And you'd say all you're doing is taking the very concepts that are used on the floor and putting them into basic computer technology. But then you see that something, as in DDR Holdings, that there's a weakness in that computer technology, and you take a new step in the computerization, an inventive step to make that computer program work better. Can that then be computer eligible or patent eligible, even if the first stage was not? Sure. No, I appreciate the question, Judge O'Malley, and let me be clear. I agree with, I think, what's implicit in your question. I don't think this is a step one case. I think this is directed to an abstract idea, and the question then is, is there something more that the Supreme Court has required in Alice and Mayo? And I'd point you to this court's opinion in Affinity Labs versus DirecTV, because I think it addressed a somewhat similar issue. And there, writing for the court, Judge Bryson noted that, quote, there was no specification of particular technology for getting the desired content displayed. And he said, quote, the essential advance is not in the process of, in that case it was downloading applications, but only in the content of the particular application. And I think that's what you have here. There's nothing here that goes to an improvement of how the computer itself functions. There's no, I click and it happens faster. There's no displaying of the information that happens faster. There's no transmission of information to the commodities exchange that happens faster. Now, it may be that by visually displaying this information in a particular way, just like visually displaying a number to call on a television in large, in a particularly large font, might be the kind of thing that is helpful to the person who's using it. But that's certainly not the test, as this court recognized in Sequinon versus Ariosa. And to come back to, I think, what's at the core of your question, Judge O'Malley, this court applying Supreme Court precedent has made clear what is not sufficient to constitute an inventive step. And there are three things in particular. One is adding another abstract idea, and certainly simply having a static price axis, which is what the district court pointed to as being the inventive step at step two, is directed towards another abstract idea. Second is limiting it to a particular operating environment. Under Supreme Court precedent, it's very clear that simply limiting it to a particular field is not sufficient for an inventive step. And the third, and the one that this court has dealt with extensively in a number of cases over the last 18 months, is the implementation of generic conventional activity, and particularly generic conventional computer activity. And that is, again, a fundamental difference between this case and DDR Holdings and BASCOM. In DDR Holdings, this court recognized that there was a particular series of, in this court's case in Capital One, page 1371, it described DDR Holdings as, quote, reciting a specific series of steps that resulted in a departure from the routine and conventional sequence of events after the click of a hyperlink. You had a specific algorithm that changed the basic operation. And here, again, you're taking any grid, any display, using any technology, and this is at column four. You can use any existing or future terminal or device. It is to use, quote, simple algorithms. That's column four, line 62 of the 132 patent. And the mapping of the information to a screen grid can be done by, quote, any technique known to those at skill in the art, column four, line 66 of the 132 patent. That is exactly generic conventional computer implementation. And I think that makes this case indistinguishable from Amaranth and from Electric Power Group. Indeed, in Amaranth, the court specifically noted that the use of conventional hardware and commonly known programming techniques, even though it resulted with menus with specific features, the menus were visually different than things that existed in the prior art, but nonetheless. Supposing it solves specific problems of prior graphical user interfaces in the context of computerized trading relating to speed, accuracy, and usability, which I'm obviously quoting from the court. And, by the way, CNFISH, because it's improving the computer operation. Well, so first, Judge Wallach, with respect to CNFISH, there is no improvement of the computer operation. And I think that's an important distinction here to recognize, that the implementation of the point-and-click technology on this particular visual display does exactly what point-and-click technology would otherwise do. There is nothing remotely inventive about how the computer itself operates in response. Now, the argument is, well, because you have visually laid out the information in a particular way, that a human is going to be able to react more quickly, or at least be able to react differently, because of how the information is laid out. Now, there may be other areas of intellectual property law that protect such a thing, but it's not the type of thing that itself renders claims patent eligible. And, indeed, the fact that this happens to be in, of course, the computing environment, isn't dispositive here. That was certainly true in internet patents itself. But there never was a well-established, long-known practice that allowed this information to be provided in this fashion when you were doing trading on the trading floor, right? Well, Judge O'Malley, to be sure, the computer trading has differences from trading that happened on the floor. And I'm certainly not arguing anything to the contrary. What I am arguing are these are claims that are directed to the organization and display of information. This court, time and again, has found that that is directed towards an abstract concept. And then the question is, under the tests that this court has repeatedly articulated, is there something more here? And the something more that they point to is either the static price axis, which is just another abstract concept, or it is generic computer implementation of generic functionality. And I would also note that the visual display of this information, the way that they display it, itself isn't something that is new or inventive. And, indeed, if you look at the blue brief at page 37, right-hand side, you see prior systems that visually display the information a particular way. Their idea here is to add existing generic point-and-click functionality to it. And I think under particularly Amaranth and Electric Power Group, that's indistinguishable from what this court found was not patent eligible. I'm happy to take more questions. Otherwise, I'll reserve the balance of my time. All right, let's hear it from the other side, and we'll save you rebuttal time. Thank you, Judge Newman. Ms. Hardimer. Good morning. May it please the court. CQG's arguments are undercut by at least three things. The first is the patents, which describe and solve the problem of creating a trade order at an unintended price using prior art GUIs that allowed prices to change during order creation. The second is the district court's decision, which properly recognized that after Alice and DDR, these claims are patent eligible because they solve that unintended price problem with an improved GUI that combines static prices and dynamic quantity indicators in a single-action order entry system. And third, Affinity Labs is your hardest case, I would think. It's certainly one of the most recent. I know we were laughing about don't give us any more supplemental authority from either side because the cases just keep coming out and coming out. But that's a tough case for you because that actually talks about specific uses of graphical user interfaces or GUIs, as you call them. I've never phrased it that way. How do you distinguish Affinity Labs? Yes. So we distinguish it because Affinity Labs, the graphical user interface used there was purely conventional. As the court said in that case, there was no specification of a particular technology for getting the defined content displayed. When you looked at the overall character of the invention in that Affinity Labs case, which is what the court did, they found that the invention was really to out-of-range streaming to cell phones, that that was really the problem they said they solved. And yet their claims did not explain how that out-of-range streaming happened. And to the extent there was a generic graphical user interface recited, it was just that, a generic computer component, which was not enough to provide significantly more at step two. I think we would have the same problem here if our claims stopped at the end of our preamble. And if I could turn you to the claim language, that's what I'd like to do next. If we look at the 304 Claim 1, which I'll point to you to read 20 to 21 has that in prose. And if you prefer the patent, it's in the appendix at 223. So I think we would be just like Affinity Labs if our claim was to be just the preamble, which says a method for displaying market information and facilitating trading, I'm skipping some words, on a graphical user interface. Certainly that alone is not patent eligible. And I think that's what the Affinity Labs case stands for. Instead, the claim recites much more. And before I turn to that, I'd also like to mention the electric power case, which was mentioned as something new that the district court didn't have. And I think in electric power, the court drew the distinction very well by saying that in electric power, the claims were not patentable. Presenting the results, and I'm quoting electric power, presenting the results of abstract processes of collecting and analyzing information without more. And then in parentheses, the court said, such as identifying a particular tool for the presentation is abstract. And so in electric power, the court kind of drew this distinction, which I think applies to Affinity Labs on the one hand, where the graphical user interface is simply a generic computer component that displays the results of this or the inputs needed for this out-of-band streaming. Whereas in the trading technologies claims, it is not at all because we have a GUI that we're new. We have an improved GUI. And if I can point you to the claims, I'll explain what we mean. So looking at the first claim in the 304 patent, that appendix 223 or red 20, whichever is easier for you to read, we talk about the GUI itself being the invention here. And it's because it solves the problem of missing your intended price with the prior art GUIs through a combination of the structure, makeup, and functionality of this GUI. So when you emphasize the 304 patent, are you restoring the distinction between the 304 and the 132? No, I just wanted to start with one of the claims. If you would prefer, I can talk about the 132 instead. Because the PTAB distinguished between them and essentially sustaining one and not the other. At least one can read that into their refusing institution for the 304. The PTAB later instituted a CBM on the 304 as well. And currently there are PTAB proceedings on both. That's what I gather and understand that there are several. What is the status of the ongoing various PTAB proceedings? So the current PTAB proceedings pending on the 304 and the 132 patent have been argued and are awaiting final written decision. The final written decision in the 304 case is due later this month. January 27th is the statutory deadline, so any time between now and then. And in that case, actually, the petitioner, the patent owner, pointed out to the board that the district court had found these claims eligible under 101. And the board said in a footnote when instituting anyway on 101 grounds that they gave little to no deference to the district court's finding and instituted anyway. So that one will be decided this month. And the 132 is due in March. That's an unresolved issue as to who defers to who. We'll get to that. And I would contend that here you have an Article III district court decision based on Supreme Court and this court's precedent. And the court is well positioned to affirm the district court here. Okay, so what you are telling us about 304, you would also apply to the 132. It would, yes. Yes, it would. In both of the claims, they recite the combination of specific structure, makeup, and functionality that solve the problem in the prior art GUIs that's identified in the patents in Figure 2 in the description. So turning to the 304 claims, we talk about structure, makeup, and functionality. This is all about how the GUI is. The pieces of the GUI is kind of what we think of as the structure. The makeup is how those pieces are put together to form the GUI. And then the functionality is what the GUI does. So if you look with me at the claim, in the first claim element, dynamically displaying a first indicator in one of a plurality of locations in a bid display region. So I would say that first indicator and the bid display region are both pieces of the structure. Other structure, the pieces of the GUI, later in that same claim element, a common static price axis. In the next claim element, we have a second indicator that is dynamically displayed in one of a plurality of locations in an ask display region. And then later in the claim, we have in the fourth step displaying an order entry region, comprising a plurality of locations for receiving commands. So each of those is a piece of the GUI, the structure of the GUI. The makeup is how those are combined to create the specific GUI in these claims. So if we go back to the first claim element, we talked about the indicator and the bid display region. The claim goes on to say that each location in the bid display region corresponding to a price level along a common static price axis. So that is talking about how the bid display region, where the indicators can move, is aligned and corresponding to price levels along the axis. So we're talking about how these pieces are combined. That's the makeup. And that's carried out throughout the claims. I would point to the third element, displaying bid and ask display regions. Those display regions are displayed in relation to fixed price levels positioned along the common static price axis. So there's this combination of static price levels along the axis and then these bid display regions that are displayed relative to them. And then there's functionality as well. So there are the pieces, there are the way they're combined, and then the functionality. So in that third step in Claim 1, when the inside market changes, the price levels along the common static price axis do not move. But at least one of the indicators in the bid display and ask display region do move. That's the relative movement, and that's actually required by the claim. We understand what the claims do. The question is whether they do enough. So do you think that your argument is better under Step 1 or Step 2? I think the argument is very strong under Step 1, particularly in light of the court's more recent decisions. I really think the district court's decision was prescient here when you see that she applied ALICE and DDR, which is what we had at the time, and found that under DDR especially, these claims improve a technology. They improve a graphical user interface, looking at the overall character of the claims, and that an improvement to a prior art technology is patentable even at Step 1. But this judge drew a clear and accurate, in accordance with our precedent line, between 101 and the 102 and 103 issues that I gather were not reached. That's right. I think she properly understood what the Supreme Court has said multiple times and this court as well, that novelty is not the question. Non-obviousness is not the question. And I think she did that by looking back at the Supreme Court cases, and particularly in ALICE, where the court drew a line between a business method with generic computer, which it found not patentable, and inventions that purport to improve computer functioning or other computer technology. That's the Supreme Court's language in ALICE. They were pointing to those kinds of cases. And I would say even in Bilski, the court was talking about a concern over not taking a machine or transformation test because it might adversely affect the patentability of software. And that was still a possibility. So what happened to those issues? Were they not raised before the judge? 102 and 103? Yes. Those did not go to trial. Okay. And so 101 was the only issue on appeal here. And the judge properly noted that she talked about the static price axis. If we need to go to step two, which she found was not necessary, but if you do, if it's a close call, like in BASCOM, we can move to step two. She said she didn't need to look any further than when she started looking at the claims themselves, the elements, that the static price axis was a feature that provided the solution to the problem that the patents described. And that, I think, if you look at the cases, that's a common theme we see. When you're looking for an inventive concept at step two to figure out if it's enough, is it the thing that solves the problem that's described in the patent and the specification? So in BASCOM, for example, where all of the elements were known individually, the combination solved the problem, the internet filtering problem that the patent described, and that was enough. Here, the judge properly noted that the static price axis, and I would say among other things, it's actually the combination of the static axis with the dynamic prices and the single action order entry. This is a problem unique to single action order entry systems. And with respect to preemption, which is one of the things covering all implementations of the purported abstract idea, I would point the court, of course they're not binding, but the court has previously looked at these patents before in the infringement context and found, several times actually, and found that some products do infringe, but other products were found not to infringe, several others. And there are others that are listed in the brief, in the red brief, that show that these are not impermissibly preemptive and that they belie the argument by CQG that all of the trading systems are covered or all ways of displaying trade information and placing an order. For me, the core issue here is the difficulty in articulating ways in which we do not discourage useful advances in the art. And that's where these cases are all grinding against each other. Many of them are very close calls, I understand that, and that's evidenced by the sometimes dissenting opinions and sometimes very similar opinions. I don't think this one is a particularly close call when you actually look at the claims and see the specificity with which the claims recite the particular pieces, the structure of the GUI, the way they are combined, the makeup and the functionality. All of that's required. I'd like to discuss the Amaranth case for a moment because that was discussed in the opening. And I think that one can be distinguished easily as the others in that it had sort of a similar business method on a computer and, in fact, the court said specifically the invention merely claims the addition of conventional computer components to well-known business methods. And while they talked about displaying menus and they talked about receiving parameters using an interface, that was not the invention. The invention there was creating these menus, finding better ways than using paper menus with waiter's pens and pencils and waiter's memories. That was really the invention there. So I think one of the things that is such a judgment call is determining the overall character of the invention. And that's where the step one, step two, maybe, is a little bit of an overlap. But here, to determine the character of the invention, you look at the patent as a whole. It describes a very specific problem, and the claims, as the district court understood correctly, claim a specific combination of features in the GUI that solve that problem. And to me, that problem solution is a helpful framework for explaining. And then to the point of the computer functioning, the argument that these don't improve a computer functioning, I think maybe what they're trying to say there is to improve computer technology, you have to improve the computer processor. You have to make the processor faster. But that doesn't work at all if you look at this court's decisions. And the court has found patentable improvements to a database, improvements to, and even DDR, it was an improvement to the web browser software. It didn't make the computer processor faster. And so I think, really, the way to think about an improvement to a computer functioning is, is there something that makes a part of a computer function differently? And in DDR, absolutely, the hyperlink functioned differently because of the software. And in Enfish, the database functioned, the database... I remember in the 1980s when Apple announced the hyperlink, and I looked at it and thought, this is fabulous. Many of these inventions are groundbreaking when they first come out, but after that, we fall to that language in 101 where it's an improvement of, right? And here, that's what we have, an improvement of a prior GUI. The GUI is a computer function. It is a part of a computer. The court has found their generic interfaces are not patentable. It's just like a server by itself is not patentable, or a database. That's not what this case is. I think this is the case that some of these others have been sort of pointing to as, this is not that. I have come over my time, so I'd be happy to answer any other questions. Any more questions? Thank you, Ms. Arner. Thank you. Mr. O'Quinn. Thank you again, Judge Newman. Trading Technologies' argument is that their claims are different from ones that have been found to not be patent ineligible because they require a specific GUI with specific features where they solve problems that existed in prior GUIs. Now, that exact argument could have been made, and indeed, in many respects, was made, in Electric Power Group, in Affinity Labs, in LendingTree, in Content Extraction, in Capital One, and in Internet Patents. But what happens really, I think, in these cases, and this is where I want you to focus, is that you get these briefs, and the arguments are fabulous. And you say, too bad the claims don't actually incorporate any of those great, fabulous things that they're arguing about. And so in this case, you do have an issue that you're up against, which is you actually have some detailed claims that recite very specific things, unlike many of the others where you had the classic wide-open claims that didn't say much of anything, and they're trying to save them after the fact. So how do you respond to the fact that these claims are as detailed as they are? So Judge O'Malley, just like in Amaranth, just like in Electric Power Group, just like in Ultramercial, yes, the claims may be lengthy, and there may be a lot of specific things that are in there, but the specific things that are in there go to, for example, content. They don't go to a technological innovation. And so if you look at Amaranth, the court said, quote, the patents claim systems including menus with particular features. There were very particular features that the claims required. They had the nesting of these menus. There had to be a linking of these menus. But the court said, quote, they do not claim a particular way of programming or designing the software to create the menus that have those features, and thus were not patent-eligible. And that's what you have here. I mean, let's be clear. For all their talk about structure, what they're talking about is content. The claims here require commodities trading using a GUI with generic point-and-click features that have been programmed by any means with any generic tools, operated on any generic computer, using any generic screen, displaying standard market information in a conventional format. That is exactly, time and again, what this court has recognized is not sufficient. And simply saying, solving the problem that was disclosed in the specification, well, that can't be enough. I mean, this court almost unanimously, in Sequanam versus Ariosa, made clear that that can't be enough. And there was far more discovery there than there is here, which is essentially just the Internet equivalent of saying, hey, with an older generation of technology, you just said, you know, here's the 1-800 number. The claim requires that it be in bold font and stay up on the screen for a long period of time so users don't miss it, so they can pick up the phone and make the call to make a trade. That's what's going on here. And indeed, if you look at Electric Power Group, I think what it said in that case is equally applicable here. You have none of the how that's required to be transformative in terms of the computer operation or any of the other technology at issue. Quote, the claims at issue do not require any non-conventional computer network or display components. That's true here. Nothing in the claims understood in light of the specification requires anything other than off-the-shelf conventional computer network and display technology. And that was even for claims that specifically required, quote, displaying concurrent visualization of two or more types of information, which was supposedly novel in that case. I think Electric Power Group is thus indistinguishable, as is this court's decision in Amaranth. What we generally see in response to such an argument are issues of 102 and 103, as well as 101, but here the decision was made to concentrate on 101. So, Judge Newman, there were invalidity arguments under 102, 103, and 112 that had been issued in the case. When the case was presented to the jury, the strategic decision was made not to advance those arguments in front of the jury, and, of course, parties in patent litigation make those strategic decisions every day, and as Your Honor noted in the questions that you were asking to my colleague, the 102 and 103 and 112 inquiry is utterly irrelevant to the 101 inquiry, and the Supreme Court couldn't possibly be clearer in Parker v. Fluke, in Diamond v. Deere, and in Mayo, and so the fact that we did not advance those types of arguments has no bearing whatsoever on the 101 issues before the court today. Yes, and the district judge recognized that. I don't think that there's any dispute about the notion that the 102 and 103 type arguments have no bearing here, and, indeed, part of the reason that we made that point is it was, indeed, opposing counsel in their briefing that argued that that somehow gave more weight to these claims, and I think that's inconsistent with this court's approach for the reasons that you've noted, Judge Newman. If the court has further questions, I'm happy to answer those. Any more questions? Okay, thank you. Thank you very much. Adequate, Ms. Arnor, the case is taken under submission. That concludes this morning's arguments for this panel. All rise. The Honorable Court will be adjourned until tomorrow morning at 10 a.m.